The final case on our calendar today for oral argument is Haspadrami v. U.S. v. Haspadrami. That is a matter that involves some classified information. No party has requested that we close the courtroom for this argument, however. We do have a classified information security officer present, and I would ask that he identify himself, please. Thank you very much. And your name is? Mr. Rucker. Very good. So you will be with us in the courtroom for this argument. Very good. So we're prepared if we need to adjourn to that, to the roving room, or for a discussion of classified material. In addition, I would want to note that the government has not requested in-camera consultation or presentation with the panel, so we are prepared to go forward in the open courtroom this morning. Very good. Okay, very good. Okay, Mr. Bacharach. Good morning, Your Honor. My name is Michael Bacharach, and I, along with Joshua Dreitel, represent the appellant, Agron Haspadrami. The question presented in this case is whether it is constitutional for the government to search and seize the communications of U.S. persons, specifically Mr. Haspadrami, without a warrant and subject to Section 702 of FISA. Quite frankly, they do not. Section 702 is unconstitutional for a variety of reasons. Here, there was no warrant, there was no probable cause determination, there was no prior specific judicial review, and there was no particularity. Can I ask, suppose the United States government develops information that a particular person located somewhere in Europe, let's say, might be an agent of the KGB. They don't have probable cause to think that, but there's some reason to suspect it. They would like to intercept his communications from his cell phone. So we've got a person, let's assume a Russian national, living in London. Can the government intercept the communications from that cell phone without a warrant? No, Your Honor, not without a FISA warrant. Under the Constitution, putting aside statutory requirements. This is a foreign agent who is... A foreign citizen abroad. And they have the opportunity to plant some bug on his cell phone in London. Is it unconstitutional to do that without a warrant? I think that would be a slightly more complicated question than what is presented here. I don't know. I thought it might be a simpler question. That's why I'm asking. I'm trying to build up to the complicated questions here. What about the Fourth Amendment would protect that person? Well, unfortunately, under Verdugo, I believe they would be able to conduct a... Well, maybe it's unfortunate, but I guess your answer is they would be able to do that. But now let me complicate the question, because, of course, in several respects, that's not what's happening here, right? Suppose... It's obviously a difficult matter to somehow get an asset into place to put a device on his device in London. But suppose there were some technological means by which, through, I don't know, the Verizon office in New York or through Google or something in California, they could accomplish the same thing. That is, a targeted interception of communications from that device in London held by that Russian national. Is that a game-changer, that they have a technological means to do something in the United States to intercept the communications of the Russian national in London? Yes, Your Honor. Within the United States, the Supreme Court has never indicated that the Fourth Amendment... Well, what they're doing is in the United States, but what they're intercepting are communications originating abroad made to or from a foreign national. Seizing it in the United States is what Your Honor is saying. So the search and seizure is taking place on U.S. soil. That is certainly well within the Fourth Amendment. And, of course, I should say this, we're focusing on the target. So is that the critical... No, we're not focusing on the target. I mean, the word target doesn't have a lot of Fourth Amendment history. I agree. But whose communications were intercepting? I mean, back in the simple days of Title III intercepts, you'd get a warrant to seize the communications of John Gotti, and you'd put the tap on his phone because you had probable cause that he would be making communications on his phone. In this place in the United States, right? And that's what you'd get. You would hear his communications with a lot of other people. Now, you want to call that the target or not, I don't think that's a question of who you're subjectively interested in. It's a question of what you're intercepting. You're intercepting those communications, right? Yes, that's true. But you wouldn't be able to then thereafter utilize every single communication that's intercepted pursuant to that warrant. Only those that are related to the purpose of the warrant. So if, yes, if John Gotti's tap on John Gotti's phone... Wait, we got a tap on John Gotti's phone because of, let's say, narcotics, and then suddenly there's a call coming in to Mr. Gotti from the governor of New York to arrange some prostitution activities. That doesn't have to be minimized if it is clearly a criminal conversation, right? That's true. And then it could be used against said governor. And there would be Title III requirements as to you'd make a report, and the next re-up of that you'd have to identify that person as a target, if that's the right word, in that context. But if you overheard, legally, a communication with someone that the government had a legal right to be overhearing, you could retain that communication and use it against that person, yes? Not every communication, Your Honor. I mean, there are limits to it in United States v. Conn. It's stated that, well, to paraphrase, the ability to collect some conversations of some non-suspects hardly leaves the executing agents free to seize at will every communication that comes over the wire. Of course not, if it's not a criminal conversation. And this is all like plain view. It's plain hearing. In these primitive days, when intercepting communications meant a fellow with headphones sitting in an office actually listening in real time to the conversations. Now, we've got a lot of differences there. I'm trying to figure out, is that not bedrock law? That if the fellow sitting, the FBI agent sitting there with the headphones on, monitoring the wiretap that is, by hypothesis, legal to conduct, hears a criminal conversation, that that conversation is available for use in evidence. Yes, Your Honor, but that's predicated under the understanding that that initial surveillance is subject to a probable cause determination. No. That's what makes that one lawful. But what if it's lawful for some other reason? I mean, the same is true of search warrants, right? If I get a search warrant on behalf of the government to search a particular place, and while I'm there, I see evidence in plain view that is obviously evidence of some other kind of crime, I can seize it. But the same is true if I was there legally not pursuant to a warrant, but for some other legitimate reason, like I'm a firefighter going in to do an emergency, to respond to an emergency, right? Or if I was invited in, no warrant, but I'm legally there, I can seize what's in plain view. Yes. Yes, Your Honor, which is why we're not making a per se challenge to the statute under all circumstances. We're making a challenge as applied to a U.S. person. That is different. A U.S. person who is here. In my hypotheticals, I haven't mentioned anyone who isn't a U.S. person. I haven't mentioned anyone who isn't protected by the force. In your hypotheticals, you've consistently stated that the basis for the initial search is lawful. Yes. We don't have that here. That's the difference. We don't have it lawful under the Constitution here. There is no warrant. There is no probable cause of termination. No, but my hypotheticals have all concerned, to begin with, a foreign person abroad. The one game changer that we've identified that you're contending is that if the United States government seeks foreign intelligence information from the conversations of a foreign person located abroad, but does it by means of some technology that enables that to be intercepted somehow on U.S. soil, that that's the key difference so far. I guess that's the key difference we've discussed so far, yes. That it was occurring here. That every element of it occurred here. But, of course, here also we have that the actor who is the aggrieved person is a U.S. person. It's not the foreigner. So it's not the foreigner who is challenged. But wait, wait, wait. No, no. That is not a game changer because I think we established that if that communication was intercepted in London by attack placed in London, the fact that an American called the person whose communications were legally being intercepted and says, Hey, I hear you're with the KBG. Could you help me assassinate the President of the United States, that it would be lawful for an agent, and again, in my hypothetical, my primitive hypothetical, he's listening in real time, it would be lawful to turn that information over to the FBI and then pursue other means of lawful investigation in the United States of that person. Right. That would be predicated on initial lawful surveillance that did not occur in this case. Yes. I mean, I guess that would be true. Why don't you go ahead and take a few more minutes. Can I just follow up on the line of questioning that Judge Lynch, and that is, you seem to make the argument that the volume of incidental collection matters. If you had a wiretap on John Gotti and produced 500 cases against 500 different people that were irrelevant to the original reason for the tap on Gotti, that that might create some question about why you got that one wiretap. I haven't seen any cases that provide that analogy, that the volume of incidental crimes that you uncover and can prosecute somehow affects the original warrant or hear another way of getting that if it's a foreign-based person. What's the basis for that? There is one case on point, Your Honor. That would be Judge Bates' October 3, 2011, Fisk opinion. In that opinion, he found that 702 specifically was unreasonable as applied to the case. Now, he was examining upstream collection, not prism collection. But in the context of upstream collection, he found that there were so many millions, 20 or 30 million communications that were intercepted in that way, of which at the very least thousands upon thousands were U.S. citizens, U.S. persons, that that number was just too unreasonable and too broad. Now, what's important to note is that out of 702 surveillance, approximately 250 million interceptions occur per year under 702 programs, and only 9 percent of that is upstream. So Judge Bates is saying that with respect to that small subset, that 9 percent, that that's way too much because it's still thousands of thousands. Well, 91 percent is actually— Your Honor, prism involves 227.5 million intercepts a year, communications a year. When Judge Bates may be confining his conversation to upstream, his reasoning is that within that 9 percent of the overall amount of 702 surveillance, it is unreasonable how many U.S. citizens are being intercepted. Well, with respect to prism, which he wasn't addressing there, it's not 9 percent, it's 91 percent. And an intercept is an individual email, is that correct? In this case, yes, Your Honor. Okay. So it is—so we're talking about 227.5 million emails a year. That is—or it could be email, it could be other forms of communication as well, Your Honor. That is 10 times, over 10 times more than what Judge Bates found to be problematic when talking about only upstream. And he was finding it unconstitutional as applied in great part and specifically because of the volume of intercepts that impacted U.S. citizens or U.S. persons. I know the Oversight Board was concerned about this too, the volume of incidental collection. Do we have any statistics on how that has changed or not since it issued its report a few years ago, four years ago? Basically, you could probably cite the statistics better than I could. I believe my understanding is that prism is being used at a greater volume now than it was a few years ago, but I don't have off the top of my head— Prism for incidental collections. Yes, but off the top of my head, I couldn't give the numbers. When I say incidental collections, I mean U.S.-based communicants. That's what you're talking about, right? Incidental collection is not the target, which is foreign-based, but it's someone who happens to communicate with that target who's in the United States. That's just what we're talking about. At least one person has to be within the United States is what we're talking about, yes. That's what incidental is, right? That's what the government calls incidental, yes. I wouldn't call it incidental. Would you agree—I mean, many people have raised concerns about the 702 program generally, but because we need to treat this as an as-applied challenge, we need to examine the circumstances as they pertain to the appellant himself and as the program was applied in that instance. Isn't that correct? That is correct, Your Honor. And notably, with respect to Judge Bates' opinion, with respect to discussing 702 surveillance, he's discussing 702 applications and surveillance that took place during the same timeframe that took place with respect to Mr. Hasbarami's surveillance interceptions. So, yes, again, I understand he was talking about upstream, but it's still the same time period, and he's finding these applications to have been unreasonable. Can I go back to another possible game-changer? I was hypothesizing, of course, very old-fashioned kind of electronic interceptions. And maybe I should preface this question by saying I have not looked at any classified documents before this argument, so that nothing that I say should be taken as implying or suggesting that any hypothetical I give is based on some fact or is something the government actually does or does not do, because I don't know. I haven't looked. I take it from the public discussion of this case that what's happening here is that the government doesn't actually in real time listen to or look at these communications. It sucks them up into a database where they reside until and unless there is some occasion for someone to look at it. That is correct, Your Honor, and they can maintain them up to five years. Yes, and what happened here, well, I don't know if it's what happened here, but the government, and I'll ask them about this, seems to be asking us to treat it as if what happened here is what you refer to as a backdoor search. That is to say that someone in law enforcement in the United States requested that the people with access to this information look up to see if there was anything involving Mr. Hajjajarami that had been intercepted. Why I say the government invites us to look at it that way is you attack this concept of backdoor searches. They don't, conspicuously do not say that's not what happened here. What happened here was somebody listening or reading the emails for foreign intelligence purposes stumbled upon the fact that Mr. Hajjajarami had volunteered to go abroad and be a terrorist, and then they reported that to the FBI, and the FBI undertook more investigation. They don't say it was only that. So I think we have to assume for present purposes that this was one of these backdoor searches. That's a fair assumption until they contradict it. Okay, and your argument is that apart from a question about whether this information was ever lawfully seized in the first place, that there should be a warrant requirement before that happens. There should be something more than just, hey guys, check out if this fellow that we have come across in wherever is up to no good. There should be some reason to search, some justification for that search, right? Correct, Your Honor. And I'm sympathetic to that concept, but I'm having trouble understanding where it would come from. Because normally if the government seizes something, again, lawfully, pursuant to warrant or whatever other exception to the warrant requirement makes it reasonable under the Fourth Amendment, then the government's got it, and if an FBI agent knows it's there in the evidence vault and thinks there might be something there relevant to some other investigation, is there any precedent that says they need to get a warrant or some other justified to a court why they want to look in material they've already lawfully seized? I can't think of a case off the top of my head at the moment. But what I'm getting at is, so then what's the theory? What is it that we could use if we were somehow attracted to this proposition that the second search, the search of the data that's already been seized and is just there electronically on some server to target a U.S. person's communications that may have been, by my hypothesis, I understand not by yours, lawfully seized in the first place? How do we get to that kind of requirement? If they could be particular in their application and specify under the particularity requirement the basis of why they would need it and the basis why they believe it would exist there. Well, that's what you'd be asking us to say, is that they would have to establish that. But what tells us that that is required? You mean besides the Fourth Amendment? What about conventional Fourth Amendment doctrine would say that on the hypothesis that the government lawfully seized communications because they were, let's even assume for the sake of this argument, intercepted abroad by tapping the phone of a foreigner located abroad. What would say that there needs to be a separate warrant requirement to query that data, to look at those communications to see whether specifically Mr. Hospitroni or someone like him in the United States came up in that conversation? Maybe I misheard you. Did you just say if the initial search is unlawful? The initial search is lawful. Oh, lawful. I'm sorry. You think it's unlawful. No, no. I couldn't hear you. Let's assume it's lawful. The initial seizure is lawful because it's all abroad. But it's in a database. No one's ever even, you know, despite the great national security importance of all this stuff, no one's ever actually looked at it at all. But now some FBI agent in Detroit or someplace has a suspect that he or she is interested in and would like to know whether in this database that has sat there on the server lawfully sees there's something about a U.S. person. I mean, that strikes me as problematic, but I'm having trouble getting a doctrine. I mean, I'll leave that to the ACLU, Your Honor. It's just so far afield of what are the facts in this as-applied challenge. None of that is relevant to what happened here. So I honestly didn't research that particular issue, and I apologize for not having done so. Well, it is one of your arguments that apart from the whole thing is unconstitutional in the first place, there needs to be a warrant, or one reason why it's unconstitutional in the first place is that there's not a requirement that there be a warrant supported by probable cause before someone in law enforcement in the United States looks at the data. I thought that was an argument. Well, no, the argument was not that there was never an argument that the initial, all of our arguments are presupposed on the fact that the initial surveillance is unconstitutional. We didn't make the argument that if part of it was, if it was constitutional, then we have to take a second, because you wouldn't take a second application if the first one is constitutional. The point is whether or not the government can save the information, can save what's been searched, based upon a future, a second or subsequent warrant, after the initial seizure is unlawful. That and our argument is that no, if the initial seizure is unlawful... The initial seizure is unlawful, but one of the reasons why it's unlawful, this is another sort of twist on the backdoor thing, it's a backdoor argument in a way on your part, that one reason why it's unconstitutional is because it permits the FBI or other domestic forces to look at data without further warrant when they're interested in a U.S. person in connection with U.S.-related crime. Roger. Can I just ask you a follow-up then? I didn't see in the publicly filed opinion by Judge Gleeson a conclusion by him that Hasbrojami was queried here. Am I right about that? All he says is a footnote that, in footnote 20, he says after he found some information out, then they got the FISA warrants. But did he conclude that there was an actual query of Hasbrojami in this case? I don't believe he concluded there was an initial query of Hasbrojami. That's correct. I believe he was concluding, based upon information that I'm not privy to, that he believed individual number one was the one who was queried at an initial point. What's not clear, however, is that after that initial point, whether or not still prior to getting a FISA warrant, the government then did a backdoor search to examine for Mr. Hasbrojami. So what Judge Gleeson is talking about is that very initial intercept or surveillance, the very initial program. I don't think there is an allegation here that Mr. Hasbrojami's phone number was listed under the 702 as the target of the 702 surveillance. It was individual number one. Or that they queried the stored information. That's my question. Lynch has asked a lot of questions about this stored information and this idea that the FBI can go in and query it for somebody they knew nothing about before they queried it. Maybe they got a tip from somebody, and they said let's take a look to see if Hasbrojami shows up at any of these 702 communications. My understanding of the publicly filed Judge Gleeson opinion was that it had not been concluded by him or established in this case that there was a particular query of Hasbrojami. Judge Gleeson made his decision based upon the fact that in his view if individual one was the target, it fit into one of a number of exceptions that the government raised. He didn't then extrapolate or discuss whether or not there was a backdoor search that followed He left it with that initial target. So whether or not one occurred after the fact, which hopefully this court believes was not based upon a proper exception to the warrant requirement, that's something he doesn't get to. But again, it's plain error. I mean, it's an over-review, so luckily whether or not he got to it or not is not so relevant. So why don't we hear from Mr. Toomey now then. Thank you very much. And you'll have several minutes for rebuttal. Thank you. Mr. Backrack. Good morning, Your Honors. I'm Patrick Toomey, representing Amici ACLU and EFF. Thank you for giving us the opportunity to argue today and may it please the Court. I'd like to do three things with my time this morning in addition to addressing and giving the Court our view on some of the important questions that the Court has raised so far. First, I want to explain the fundamental problem with this surveillance. Agents across the government are reading and sifting through Americans' Internet messages without getting any kind of individualized judicial approval. So, Mr. Toomey, you're approaching this statute as a whole program as opposed to looking at exactly what happened to Mr. Hesperami, right? No. We are focused on the specific loophole that the government exploited in Mr. Hesperami's case, which is it collected the emails without a warrant on the basis that it was targeting a foreigner overseas and then it turned around and it used and we think quite likely queried those communications in the way that Judge Ferroni, you were asking, in order to make use of them in an investigation of Mr. Hesperami. Just to respond to your question, Judge Ferroni, about the role of the backdoor search, the Privacy and Civil Liberties Oversight Board issued a report in which it said that the government uses these backdoors, the FBI uses these backdoor searches whenever it opens a national security assessment and the government has not provided any information in the public record to contradict that description by the Privacy and Civil Liberties Oversight Board. The board also said they used it for domestic crime investigations too, right? That's right. They said that they are routinely used in both national security investigations and in searching for information in the course of domestic criminal investigations. I want to emphasize at the outset as well that we think that the court can resolve this challenge narrowly by requiring stronger safeguards in the minimization process. And our solution, as I think Judge Lynch was perhaps driving at, involves the government obtaining individualized judicial approval at the point where it seeks to retain, use, or query an American's communication. And you asked Judge Lynch, where would that requirement come from? And I want to be clear that there are two lines of cases that support that type of requirement. The first line of cases are what the court might call the minimization cases, the cases dealing with the inherent risks of electronic surveillance and its potential to sweep up private information that judge the lawfulness of surveillance based not just on what occurs at the outset, but on the safeguards that apply to the collection once the information is obtained. So in this very case, the government points to its minimization procedures to argue that the surveillance is reasonable. And those minimization procedures in the government's view, or I think it's undisputed, at least in some way, shape, or form, control the retention, use, querying, and dissemination of the information. Right, but why would it be required that the minimization minimize, that is to say, destroy, not listen to, not make part of the interception ultimately, criminal conversations that are made by a United States person that would be, in old-fashioned parlance, overheard during what is otherwise lawful interception of conversations by someone that the government has a lawful right to intercept? Well, first, I think that the lawfulness of the surveillance is exactly what that issues. Yes, but you're saying now that the lawfulness could depend. We could say it's lawful to do this stuff if you have minimization. And I'm asking, well, fine, but why would the required minimization include anything that involves the United States citizen, including criminal conversations? Because the procedures that the government applies are so permissive at the outset, reasonableness requires the government to apply stronger safeguards to the Americans who are swept up. But why would the safeguard exclude criminal conversations? In other words, go back to the old Title III domestic situation. I'm listening to, the government is listening to the conversations of someone that they've gotten a warrant for. And something else is said, but it's not private, it's not somebody talking about their medical history or their sexual activity or their political views. It's somebody calling up to solicit a new crime from the person whose phone is being tapped. We don't have to minimize that. So why would we have to minimize that in this context? Well, Title III addresses that scenario, Your Honor. It has a provision that is directed at other crimes information that's obtained when the government has authorization to collect on one crime. And what Title III says is even in that context, the government has to go back to a court and get approval to use that information in subsequent proceedings. And what the McKinnon Court also said in those circumstances is that the risk of that overcollection is minimized by the fact that the government at least has to show probable cause for the original offense at the outset of that surveillance. And here there's no probable cause showing that restricts the original collection. I'm having trouble understanding why that should matter. If there is a legal basis for overhearing the conversations in the first place, if we're saying, okay, the government can target the foreigner abroad, then why would the minimize... And I'm fine with the idea we have to do all kinds of things at the other end, but what does that have to do with if we overhear during that conversation someone plotting a crime in the United States? Wouldn't any reasonable minimization requirement say, yeah, you can keep that? And by the way, after you've kept it, you're not going to sit on it in the CIA vault. You're going to give it to the FBI to investigate what's going on. Why is that? What is wrong with that? Your Honor, the Fourth Amendment interposes an individual judicial officer between Americans and the government, even the government's criminal investigations, even when the government has a legitimate criminal purpose. And that requirement, the probable cause requirement, the independent judicial officer, particularity, they are all absent at the outset of the surveillance. And therefore, we submit that reasonableness... All that stuff is also absent when the firefighter goes into a burning building or when a government agent is invited into premises for some unrelated purpose and happens to see something in plain view that is evidence. And we don't say, oh, wait, my God, we need to get a warrant before that can be seized if it is plain that this is evidence of criminality, it can be seized, retained, used. Well, as the court, I think, knows, the plain view doctrine gets quite complicated in the context of digital surveillance with the broad and over-inclusive nature of that surveillance. So I think the question of how the courts should treat that type of over-collection in this context, where the government is surveilling foreign targets on the basis of their foreign status alone under a single court order every year, requires a close examination of the breadth of that collection, especially when... The other game-changer is, as one of Judge Vernon's questions suggested, the volume of what's happening here. It's like Carpenter. It's a case where it's one thing to follow somebody around. It's a different thing when you're collecting somebody's... It's one thing to get his phone records. When those phone records reflect what numbers he called, it's a different thing to get phone records that actually show every place that the person went for a month. It's that kind of thing that makes us much more concerned than in the simple hypothetical of the old-fashioned over-here. That's right, Your Honor. As the Supreme Court has shown in its recent trilogy of privacy decisions, the courts must be quite careful in extending analog era precedents to new technological scenarios like this one. The government is exploiting the incidental over-here rule on a programmatic basis. It's conducting surveillance of more than 125,000 foreign targets a year under a single court order and sweeping all of those communications into a database that can be exploited by FBI agents around the country for five years. We, of course, think that the government's incidental over-here, its reliance on that rule is wrong as a matter of law, but it would be dangerous to uncritically extend those cases that were developed in the analog context to this case. To make sure I understand what you're arguing for, you focused on retention. So the program that you believe would be constitutional would balance privacy in a different way and would say that the government has a duty to review or to toss within weeks after an incidental over-here if there's a U.S. person involved on the other end of the line. You just kind of designed a different, faster program. What would you do? No, Your Honor, I want to be very, very clear about this because it affects the practicalities that the government has invoked at times in its brief. The government says that it would be impractical to know in advance whether a foreigner will communicate with an American, and I think that the amount of information that's at issue in this program shows that the government is simply unable to review it all as it comes in the door. Instead, what we are suggesting is that the government, when it knows that it has encountered or it seeks to exploit an American's communications, at that point it should be required to obtain individualized judicial approval. And there is a precedent... It can retain them, you would say, because obviously there's more... It could retain... Especially privacy concerns with proceeding to review everything as opposed to nothing. That's correct. If the government wasn't aware that an American's privacy interests were implicated in a particular communication and that communication sat untouched for five years before being deleted, that's how the process would play out in that context. But when the government is either examining communications and it knows that there's a U.S. person involved and therefore a protected privacy interest is involved, or when it seeks to query the communications, to do a backdoor search of communications that it knows belong to an American, at those junctures it should be required to get individualized judicial approval. And I want to stress there's a precedent for this in FISA itself. In 1801, H4, in a very analogous situation, there the government is conducting warrantless surveillance directed at places like U.S. embassies on U.S. soil. The government doesn't have to obtain FISA court approval in order to conduct that surveillance because the expectation is that communications between embassies and their home countries will be communications of foreign power. You said U.S. embassies on U.S. soil. Foreign embassies on U.S. soil, thank you. But when the government discovers that it has, in fact, obtained a U.S. person's communications in the course of that warrantless surveillance, it's required to go to the FISA court within 72 hours to get permission to retain or use those communications. And that is the same type of process that we submit should apply here when the government encounters a communication in which it knows that there is a protected Fourth Amendment interest. Let me just be clear on what you're covering with this requirement. Assuming that someone in the foreign intelligence community is looking at these communications of whatever he's called in the public record individual number one who is, by hypothesis, a foreigner located abroad. And they're doing that to find out maybe he's not somebody of interest after all or maybe he's an important al-Qaida operative. We're trying to find that out. So they listen to these communications and they hear what is obviously an American calling him up to say, how do I get to go get training to join ISIS? At that point, you're saying the thing to do would be to go to a court, the FISA court maybe, and say we've got this American communication. It's clearly a potential evidence of a crime. Can we keep it and use it to investigate that fellow in the United States? That's what has to be done. And what showing would have to be made? We think that the showing would be a probable cause. The government should make a showing on par with the warrant requirement that would ordinarily apply. But I want to emphasize that there are multiple ways that this type of showing could conceivably be addressed. And these types of approaches are illustrated by the range of voices that have called for stronger safeguards for Americans. So the court can look at Annex A in the Privacy and Civil Liberties Oversight Board report, which calls for stronger protections for Americans, or Recommendation 12 in the President's Review Group report. So there is a range of options, and the court doesn't necessarily need to resolve that question because the surveillance here didn't involve any of these safeguards. Like the Supreme Court did in the Berger case, the court could identify the flaws in the surveillance and leave it to the government or Congress, if it chooses, to address the precise procedures that would apply. And I want to emphasize that the government can adopt and seek permission to use new minimization procedures any day. It has that power under the statute to seek permission to apply stronger minimization and to seek the FISA Court's approval to use those procedures. So this would not require a change in the statute, and it does not require the court to strike down the statute. One thing I do want to get back to, though, Your Honor, is the second line of cases that support restrictions on the use and querying of communications, because I think it's important for the court to recognize that there is another set of cases that make clear that the scope of a search is closely tied to the justification that is provided. And here the government is relying on the lack of the foreigner's Fourth Amendment rights in its view. And this line of cases includes the Supreme Court's decision in Riley, and I think this court could also look to its own decisions and those of other circuits addressing computer hard drive searches. So in both those contexts, the government was entitled to seize a whole lot of information based on one justification. But when its justification shifted, as in Riley, to seeking evidence on the phone, it had to, the Supreme Court said that the government couldn't just rely on its own protocols, but had to rely on a subsequent warrant. And the same thing this court has suggested is at least a good practice by the government when it has obtained a mass of information on a computer hard drive under a warrant for one crime and then wants to search through that information again in order to investigate a different crime. Very good. Thank you very much for your arguments. We'll hear from the government. May it please the Court, my name is Seth Ducharme and I represent the United States in this case. Your Honors, I respectfully submit that the surveillance that was conducted in this case pursuant to Section 702 of the FAA comported with constitutional requirements and that the underlying principles at play were reasonable within the reasonableness prong of the Fourth Amendment and were, in fact, appropriate under the circumstances of the fact of this particular case. I want to address a few questions, if I may, that I've been listening carefully to from the bench. And I think this case is in the line of cases that's come before this Court, which really highlights the intersection between technology and Fourth Amendment jurisprudence. And I think if you start at the Verdugo or Kide's point in the analysis, as Your Honor did, I think it becomes clear that there is no Fourth Amendment protection for, to use the term, the target of the 702 surveillance in this case. And then it becomes a series of steps to get to the point where the United States government is looking at the e-mail content of a U.S. person. And are those steps reasonable? And I would submit to you that they are. Your Honor, to the extent that there's any question about the way the criminal case arose in Mr. Hasbirami's case, it was not a criminal case that arose from a so-called backdoor query. I think Judge Gleeson's opinion establishes, and if it doesn't, the order of things. I want to make that clear here today. In this case, the government had targeted a person or persons who were indeed foreign persons and abroad, who were indeed discussing matters of international terrorism. And after the government learned that one of the communicants in those conversations, e-mail communications, was a U.S. person in New York, the government sought an order from the FISC and provided probable cause and satisfied the FISC so that the government could focus on the U.S. person. You're talking about the beginning of the Title I and III? That's correct, Your Honor. And so, you know, having lived with this case since July of 2011, you know, my regret is that we didn't get here sooner. My regret is that our notice was late and that while we gave Mr. Hasbirami notice of his Title I surveillance, we did not until much later give him notice of the Title VII surveillance that had been incorporated into the FISA warrant. But I think it's important when you look at this case under the totality of circumstances and you ask what is reasonable for government action in matters of international terrorism that involve communicants abroad and communicants in New York, I think the case stands as a good example of what is reasonable. And I would submit to you that, you know, Your Honor, in your hypothetical, Judge Lynch. I just want to get back to what in the record tells us what you just said. That is to say I thought that your brief dealt with the backdoor search issue by saying it wouldn't make any difference if it was, not by saying that didn't happen. Yeah, well, I think it's important, Judge, because had it happened, I think that would have also been law. Well, that would be a separate question. But if it didn't happen, we wouldn't have to reach that question. But I'm not sure that there is some finding or even some record basis, at least in the non-classified record of the case, to establish that what happened, I take it you're telling us, is not an FBI agent in New York interested in this person for some other reason asked to check the database to find out if there was Section 702 surveillance, but rather that in the course of pursuing the foreign intelligence objectives of 702 surveillance, someone in that side of the government came across this communication and then in effect referred it, complete with an application for further surveillance, supported by the probable cause, the probable cause being what was heard on the 702. But that's what in the record tells us. If it's ambiguous, Judge, frankly, you need not disguise that, I think, because you could find that even had the government queried, it would still have been lawful. I read, I was just looking back at Judge Gleeson's opinion, which we've cited in our brief at page 86, and I read Judge Gleeson's finding to stand for the proposition of the sort of order of events. But I could see why the Court might speculate and why, frankly, defense counsel might speculate about the order of operations. So to the extent it becomes a critical question to the Court and there are ambiguities in our briefing, we'd be happy to provide supplemental briefing. It's certainly not my intent to go outside of the four corners of the record here, Your Honor. Am I correct that in the Mohammed case, the Ninth Circuit concluded there was no querying of him? It didn't have to address that issue of whether this whole backdoor search aspect of it was reasonable? That's my recollection of the opinion, Your Honor. But I want to make clear I'm not conceding that even if querying is done, that it's unconstitutional. Well, you're obviously not conceding it. But on the one hand, we've got people saying the whole program is unconstitutional from moment one. And we've got the government saying, oh, we could do kind of anything we want with that information. And it would seem to me if it's not necessary for this Court to deal with those propositions because there is some narrower ground, it would behoove us to pursue that possibility, right? I mean, you may at this moment, you might like it if we reach the backdoor search issue and agreed with you, but you presumably wouldn't like it very much if we reached the issue and didn't agree with you. And you started by proposing that very narrower ground. Well, I think it's important, Judge, because I'm tempted, I think, as Hasbiz Rami is and the ACLU too, to take on sort of the whole program. But that's really not the burden, I don't think. That's completely the burden that's on me today because it's an as-applied challenge. And so I think the facts do matter. And therefore, what is the government's position about what the record shows, about whether this resulted from a backdoor search or not? It did not. It did not. The criminal case. And the record shows that.  If the record is ambiguous, it's not my intent to supplement the record here today. I will endeavor to point to what I think in the record could lead the Court to that conclusion if it's helpful in a post-hearing letter. But I think the Court could find that the search was constitutional in this case without reaching the backdoor question. I respectfully submit that. We might also have the option of a Jacobson-type remand to have the district court resolve that issue if there is some, if we still find it ambiguous based on the record references that you tell us about. You could, Your Honor. If you don't want to reach the question of whether or not the lawful collection of these, lawful collection and retention would allow the government to do that, then I suppose you could. I mean, I take it you agree that it is at least one step easier of a case, and this is why I think you began by arguing it this way, that if someone pursuing the legitimate foreign intelligence purposes for which this surveillance exists is looking at the communications of a foreigner located abroad who has putatively no Fourth Amendment rights at stake and comes upon this communication with an American that seems to reveal a crime, at least where, as you put it, the next step is to go to a court, reveal that that's what the government has learned, and seek authorization for further surveillance of the American person. That's an easier case than if someone in the United States law enforcement community just says, I'm interested in this guy. Tell me whether you've ever heard anything, you know, that you may not even know about yet that's in your database of foreign intelligence surveillance. I mean, that's one further step. And, indeed, the ACLU made the argument that that's such a critical step that there should be some kind of warrant requirement interposed there. And I would respectfully submit, Your Honor, that there shouldn't be, and some of it is a nonce of practicality. And the hypothetical that you provide, and in fact in our case, when you talked about the KGB agent in London, you had initially a pretty unequivocal statement of illegal activity. And so one could imagine in circumstances like that, well, let's go straight to the fist, because we've now seen that there's a U.S. person involved in criminal activity. But I would submit, Judge, and if I can pose a hypo of my own, given the types of tradecraft that the targets of 702 engage in, whether they be KGB agents or members of Al-Qaeda or ISIS, it's not always immediately apparent, or even soon apparent, that there is a crime afoot. And so what you'd be doing, essentially, is imposing a burden on the intelligence community that I just don't think is required by the law. I wasn't imposing any burden at all. I was suggesting that if in this case you did have such an unequivocal communication, giving at least probable cause to believe that the American was involved in criminal activity, providing material support, that then this, as applied challenge, might dissipate. Can I ask one other question? The other game-changer that Mr. Bacharach referred to is that this surveillance takes place in the United States. Yes, sir. And if you go back to Verdugo, I mean, the fact that Verdugo is not an American national in any way, shape, or form, lives abroad. If he owned property in the United States, would it, I mean, there's no precedent, is there, that suggests that the government could just search that property because the person who owns it is a foreigner who lives abroad without any warrant or probable cause? I don't think there is, Judge. I mean, to sort of make it real, if you imagine the kind of voluntary, I forget what the term the Court uses in Verdugo, voluntary contacts, or essentially veiling themselves of some connection with the United States to have an expectation of privacy. If you had a foreigner come to the United States and rent a summer home here and return to Paris, say, I'm not asking this Court to find that we could search that home without a search warrant under Rule 41. So what is the difference if there, I'm going to have another follow-up about this particular aspect. What's the difference between searching the foreigner's property that he owns in the United States and seizing communications at a facility that are stored or passed through a communications facility in California? I think it's, one, a function of technology, and it's essentially that, based on American innovation, we built an infrastructure, a technical infrastructure in the United States that affords essentially free communication to those around the world who want to take advantage of it. So if you're an internet cafe in a foreign country, you can sign up and get a free email account. Innovators in the United States built that. And so the question becomes, if the United States government wants to avail itself in some way of the existence of that infrastructure, should they be barred by the Fourth Amendment or the warrant requirement of the Fourth Amendment if the owner of that email facility, let's say, is a foreign person abroad? And I think if you go back to Verdugo, and I think if you look at the facts of this case, you know, we don't have a case here where you had sort of a community of people who had a strong connection to the United States who, in our view, had an expectation of privacy from the United States in those communications. So I think that it's really a question of importing, almost literally importing, the reasoning of Verdugo into a technical world where the infrastructure in the United States now contains communications that conceptually are moving around outside the borders of the United States but can be accessed from within those borders. Can I ask a question about the database? My understanding is that the statute was amended this year to require the FBI seek and receive a court order before searching a 702 database about a U.S. person. Is that correct? It may be, Your Honor, and I don't want to speak incorrectly. I have tried to focus my attention as much as I can on the facts of the case and the program as it existed at this time. But to the extent that would be helpful to the Court, I'm happy to provide a supplemental letter to clarify. I just wondered whether that was something, yeah. There's been substantial public debate about the 702 program leading up to its reauthorization in January in the context of the public hearings and some of the work that PCLOB did. There has been an evolution, certainly, in the way the program is exercised. But the program has also grown in size, right? I mean, we've heard very large numbers about the number of communications of one kind or another that are retained and built into the database and would be subject to the minimization procedures as well as the five-year age out. But given that the statute allows or seems to allow examination for any kind of criminal activity, not just foreign or terrorism, it seems that it has a lot of potential for use and some kind of showing before accessing it with regard to U.S. persons seems warranted. So that's why I'm interested in the current status. Yeah, and I definitely see the appeal of that, Your Honor. And I think maybe if you conceive of it as well in the way that information is collected, and this goes back to one of your questions, Judge Lynch, I wouldn't assume, in fact, I would urge you not to conceive of the program as a program that just scoops up information and leaves it around indefinitely or for a period of time to be queried, at least not on the facts of this case, if I can point back to this case. You know, this case involved very, very focused attention by the U.S. government in real time or close to real time on the communications of foreign persons who were involved in international terrorism. So I'm not blind to the possibility that the government can, and I suspect does, retain some amount of information only later to be reviewed. But, again, that's not the facts of this case. And, again, where do we know even that? In other words, not just what led to the involvement of this particular criminal defendant, under investigation, but where does it say, at least in the public record for now, that this information was being reviewed in close to real time with respect to the communications of the target? Well, I would ask you, Your Honor, to draw that inference from the timeline of the investigation that the government has laid out in our public brief. You know, we've explained in our brief that the investigation of Mr. Haji Bajrami began in or about April of 2011, and that his arrest was on September 6th of 2011. So perhaps it's not fair to ask you to draw the inference that it was real time or close to real time. The relevant question, it seems to me, is what were the dates of the conversations that led to the investigation in April of 2011, right? In other words, if that was all based on communications that had taken place in 2006 or something, that would tell a very different story about whether the government was pursuing this foreign individual in real time or not. Yeah, well, again, Judge, I would encourage you to, if you look at the background section of our brief, in particular the description of the events leading up to the investigation, I think we have characterized the relevant communications at the heart of the government's criminal case, which we concede essentially were derived from the government's surveillance in 702. But if it's ambiguous, that's a failure on my part in the briefing. I just wanted to ask you about the volume question. In other words, if the goal of 702 initially was to target people who live outside of the United States, but somehow it's shifted because there's this huge collection of documents that are e-mails that are kept for five years or so, and the number of queries of those people who are in the United States had grown and grown to such a number that it looks like the program, I'm not making this conclusion, but I'm asking whether if that occurred, would that be a different problem in the reasonableness of the use of that statute? In other words, if querying U.S. citizens really became the focus of law enforcement rather than the initial purpose of targeting examination of people living abroad, wouldn't that be a problem for the reasonableness determination of the statute? Not necessarily, Your Honor. I think you have to start out at the point that this Court has at least raised today as to whether or not the initial collection is lawful. The U.S. government has relied on a statute that Congress has given us. There's been public debate on the statute now. The handful of cases around the country to look at the statute in the as-applied context have found it constitutional. So then the question becomes, if you're lawfully collecting, even if it's a substantial amount of information, if you're lawfully collecting that for a proper foreign intelligence purpose, and then you have it, why ought you not to avail yourself of that information in support of a law enforcement mission or another foreign intelligence directive? In other words, why, if the information is collected lawfully in the first instance, why then should the government tie one hand behind its back in pursuing a law enforcement mission or a national security mission? Well, the Board was concerned about that, right? Yeah, and I think, Judge, it goes to whether or not— The line of constitutional reasonableness with the volume. Didn't it make that conclusion and have a recommendation about that in its report? Yeah, look, I don't think it's irrelevant, Your Honor. I mean, I don't think I can—you know, I'm not trying to dismiss it with the back of my hand. But I think that if the information— and remember, these are just the portions of the communication that relate to the foreign person in the foreign country. So we're not talking about amassing, as I think some fear, all of the communications of U.S. persons. We're talking about collecting a limited number of those communications, those portions of the communications that are had with foreign persons in foreign countries who have some nexus to a foreign intelligence interest. Some of the legislative history of the statute also suggests, though, that a purpose of the statute is to collect information about U.S. persons. Is that correct? Well, I think that it's certainly an important equity in the collection. So, for example, I mean, looking at— Equity meaning like a government interest. Yes, absolutely, consistent with both the national security interest and then to some degree, I suppose, the criminal law enforcement interest, but primarily the national security interest, Your Honor. And it's because, I mean, if the facts of this case make clear, we would be perhaps most interested in a U.S. person in New York City who is communicating with a person or persons abroad about matters of international terrorism. In another way, why is it a matter of foreign intelligence interest to the United States to listen to a particular foreigner? It might be interesting to know what China is up to in Somalia, but it would be vital to know what al-Qaeda or North Korea or someone is up to involving the United States. That's really the ultimate point is to protect the United States against attack. So to the extent that we're trying to get intelligence about what various foreign enemies might be engaged in, a principal bit of what we want to know they're engaged in is whether they're planning terrorist attacks in the United States. Well, certainly, Your Honor. I mean, terrorism has an imminence to it in the national security interest unlike many other types of national security interest. Can I ask one other thing about the other criminal queries? And I'm very cautious about referring to these things because I don't know what the terms really are. But in the Statistical Transparency Report for 2017, there is a table at page 19 that lists the number of reported instances in which FBI personnel received and reviewed Section 702 acquired information concerning a U.S. person in response to a query that was designed to return evidence of a crime unrelated to foreign intelligence. In the year 2016, the number is one. And in the year 2017, the number is zero. I don't know whether that's true or not, and I don't know what is hidden behind these particular terms. Maybe there's a careful definition there. But it does suggest that to whatever extent this data might be of interest to local law enforcement of domestic crimes in the United States, that doesn't sound the same kind of number as on the previous page where we're talking about in 2016 30,000 queries concerning a known U.S. person of unminimized non-contents information obtained under 702. So I'm not sure what all these terms are, but at least that chart doesn't seem to suggest that the FBI is routinely saying, you know, might you just happen to have anything about this local drug dealer that we're interested in? But, I mean, are those numbers that are familiar to you? They're not numbers that are familiar to me, Your Honor. I don't have a reason, you know, to doubt them or adopt them one way or the other. I mean, as a practical matter, this Court is thoroughly familiar with the sort of conventional criminal case. And to be candid, you know, the FBI and other federal law enforcement agencies, in most instances, the vast majority of instances, I think it's fair to say rely on more conventional investigative tools to solve a bank robbery or drug crime than 702. But that's not to say that they couldn't lawfully do it. And I see that as the question being put to me. And I suppose my analysis is— That's also not what this case is about. It's not, Your Honor. This case was not local law enforcement in that sense. It was domestic criminal activity that has a foreign intelligence counterterrorism valence. Yes, Your Honor. All right. Mr. Descharnes, is there anything else you'd like to say before you call it a day? Unless you have any additional questions, I think I will rely on our briefs. Thank you. Very good. Thank you very much. Mr. Backrack, you have several minutes for rebuttal. Thank you, Your Honor. Actually, if I may, I'd like to yield the majority of my time to the ACLU, if that would be— Sure. There's just one point I did want to make. The government—I mean, obviously, the main issue here is an as-applied challenge, which is whether or not the surveillance that took place here was constitutional at the outset. And the government said something kind of interesting at the beginning of their arguments that I just want to impress upon Your Honors. They said that the one regret here—the one regret here was that the notice of the surveillance was late. Let's be very clear here. It wasn't accidental that it was late. It was intentional that it was late. And Judge Gleeson made a specific finding, that it wasn't simply this office not blaming Mr. Duchene, but actually a system-wide, DOJ-wide decision not to disclose— not to comply with the notice requirements of 702. If that's the case, it asks a simple question. What are they afraid of? So I'll leave the rest to the ACLU. All right. You have two minutes, Mr. Toomey. Thank you, Your Honor. First, to return to the backdoor search question, I want to emphasize that whether a backdoor search occurred here or not is not dispositive of the Court's resolution of this case because there's no question that the government relied on many of Mr. Hazlodrom's emails intercepted under Section 702 in order to pursue its investigation of him. But to the extent that the fact today— Let's back up. You wanted the sequence to be, as I understood it, that if someone reviewing these communications for a foreign intelligence purpose came upon Mr. Hazlodrom's conversations, that person should go to the FISC and say, We just heard this. Are we allowed to make use of it? And then maybe they'd get permission. Then the next step presumably would be to say, While we're here, Judge, at the FISC Court, please give us a conventional FISA warrant to pursue further investigation of Mr. Hazlodrom. And if what Mr. Ducharme is suggesting is the case here, that there was no backdoor search, what exactly is lost by not having taken that first step? Because the FISC Court was aware of where this information came from and what it was and said, Hmm, that sounds like probable cause to pursue a further electronic surveillance of Mr. Hazlodrom. So, first of all, some of the facts that have been described today by the government are not very well fleshed out in the public record. But I do want to say that it's clear that the government relied on many of Mr. Hazlodrom's e-mails to obtain its Title I and III warrants. The judge says that in his opinion. And that makes it clear that the government didn't just look at one e-mail, didn't just realize it had encountered one e-mail of a U.S. person before going to seek permission to examine the rest of Mr. Hazlodrom's e-mail account. It parsed through many of his e-mails. And the solution that we're suggesting, whether or not there's a query or mere use of that information, is that at the moment when the juncture when the government realizes it has encountered an American's communications, not after it's looked through everything it might already have in its warrantlessly collected database should it go to the FISC Court. Can we keep this one? That's right. We've established a contact. And then they continue to listen to individual number one's communications, and they get a second one from Hazlodrom, and they go back to the FISC Court and say, can we keep this one? Yeah, I guess you can. And then the third and the fourth and so on until they have enough to come back to the FISC Court again and say, now we've got all this information. But if the first one did not in itself establish probable cause, you can't keep the first one. Well, the government has plenty of other tools to obtain information that could go into a probable cause-based application directed at either Mr. Hazlodrom or at the other end of the communication. Absolutely, absolutely. But when you have that first communication, and it's not quite enough that on its face it gives you probable cause to do anything, you destroy that one. And then as you continue to listen, you come upon another one. But when you've destroyed that one, is it a fruit of an illegal something for the government to start cranking up an investigation of Hazlodrom in the United States by conventional law enforcement methods, surveillance, talking to his friends, whatever else? I think the way in which the type of evidence and the way in which the government would put an application to the court could be worked out through the minimization procedures. But if the court is asking, would the mere fact of the contact between Mr. Hazlodrom and a foreigner overseas be acceptable to rely on in the course of that broader showing? I think, yes, the mere fact of the contact would be available to the government. Right, but somebody has read that email that we're now going to minimize, right? And that be used when the second one comes up to go back to the Fifth Court and say, remember that first one? That wasn't so good and you made us destroy it. But you should take that into account when you look at the second one and decide whether we can keep this one? Just as Congress provided in the existing provisions of FISA, which prevent the government from relying on the contents of the intercept, warrantlessly intercepted communication, the government in that context is able to rely on the fact of the contact and in addition to whatever other information is required. The fact of the contact, I mean, it could be that it's a cousin. It could be that it's a mother. The fact that you had a contact with somebody abroad who's of intelligence interest is very little. But the fact that there was something about the conversation that suggested, even if it does not in itself justify a search warrant in New York, surely that's more significant and surely that's something that the government agent who reviewed the communication knows. But that's going to be excluded at step two? I mean, it seems to me like a very peculiar kind of requirement when what happened here was in the course of listening to the things that it's supposed to be listening to, at least in your view, I'm not sure about Mr. Bacharach's view, of individual number one, it comes upon the fact that there's this guy in New York who's calling him up all the time and talking about joining a terrorist organization. And then what they do is they go to a court and say, here's what we've got. And the court says, that looks like probable cause to me. I'm going to give you a warrant to pursue further investigation of this individual. I'm having a lot of trouble figuring out what's so terrible about what happened in that sequence. Well, as the court, I think, recognizes, the government warrantlessly reviewed many of Mr. Hazlitt-Rahami's communications at the outset of its investigation. And I think in any other circumstances... And in the context of its review for the communications of a foreign individual. Well, again, we don't... I hesitate to adopt... We don't know that. We don't know the government's purpose in reviewing these communications or how it came to pass that it was reviewing these communications, that there have been some new facts suggested this morning, but none of those facts appear in the public record. And I would urge the court to allow the parties to brief those questions if this case turns on it. But there's no question that the government reviewed Mr. Hazlitt-Rahami's communications in which he has a protected privacy interest and that it did so without any type of showing in any individualized way. I'm still puzzled. You know, a conversation takes two, right? Like a tango. So if the targeted person, so to speak, if the communications that we are listening to in this particular situation are those of individual number one, the point is to find out what he's up to, right? And you're saying as soon as he talks to an American, what he's up to is no longer a justification for listening to his conversations. The court should start its analysis where the Fourth Amendment analysis usually begins, which is whether there is a protected privacy interest in the place or the thing being searched. When individual number one is communicating with foreigners overseas, perhaps that's not present, that's not before the court.  And this goes to the incidental overhear cases, too. There is no question the government doesn't dispute that there is a protected privacy interest in that communication, and that triggers a different level of protection. It's very clear that the government's claim that it can look only at one side of the coin, only at the target foreigner under Verdugo, does not implicate the same facts that are present here. And I want to say with reference to the incidental overhear cases more generally, it should raise a red flag for the court that the government is relying on a set of cases that all involve warrants in order to justify the broad warrantless collection of Americans here. And the implications of its theory, not just in the foreign intelligence context, but in the broader criminal context, are quite significant. And I thank you, Your Honor. Very much well argued. Thank you very much for your arguments. That concludes oral argument in our calendar today. And we will obviously take this under advisement. The final case on the calendar is on submission. That's U.S. v. Bathia, and the clerk will please adjourn court.